DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**NICO VINCENZO GALLO,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D18-1236

[April 10, 2019]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; Lawrence M. Mirman, Judge; L.T. Case No. 43-2016-CF-000919A.

Carey Haughwout, Public Defender, and Claire V. Madill, Assistant Public Defender, West Palm Beach, for appellant.

Ashley B. Moody, Attorney General, Tallahassee, and Melynda L. Melear, Senior Assistant Attorney General, West Palm Beach, for appellee.

**ON MOTION FOR REHEARING**

GROSS, J.

We grant appellant's motion for written opinion but deny his motion for rehearing and to certify conflict or a question of public importance. We affirm the conviction and sentence. We write to address several of appellant's arguments regarding the sentence imposed by the circuit court.

### *The Crime*

The victims in this disturbing case were a woman and her son. The woman was at home, sleeping in her bedroom, when she heard someone trying to enter through the front door. She called her son as she went to the living room. There, she saw a broken top window panel. She pulled back the drapes and saw appellant.

Appellant said, "I'm sorry, I'm sorry . . . I'm going to die today." Appellant then "cannonballed" through the bottom window panel into her living room and began to fight with the son as he approached to protect his mother. The son tried to hold appellant down, but he was overpowered. The woman hit appellant on the head with a baseball bat several times. The son continued to wrestle appellant, trying to restrain him. Appellant wrapped his legs around the son's neck. The woman called 911—she said that she was bleeding and that her son was "opened up." She said that appellant was trying to take the bat from her. She said, "He's just going crazy, he's attacking."

A deputy arrived at the house and saw "blood everywhere." The woman's son was on top of appellant. The deputy secured appellant in wrist restraints, but when asked for his name, appellant "swept [the deputy's] legs out from underneath him" and kicked the back of the deputy's leg. While another officer was retrieving leg restraints, appellant grabbed the first deputy's pants and "shredded 'em." After appellant was secured with leg restraints, his mood alternated between periods of calm and aggression. While calm, he told the officers his name and that he took drugs. When he was aggressive, "he was trying to drink the blood that was pooling from his own head on the floor" and "appeared [to be] having a conversation with Satan."

At a sentencing hearing, the woman described the incident after appellant broke into the living room:

> [Appellant] started screaming kill me, kill me, I'm going to die tonight. My son kept telling him just calm down, stop, I'm not going to hurt you, just hold still. I had bolted past to grab my phone and I grabbed a baseball bat that I kept next to my bed, I came out and I, my fear was running everywhere, my biggest fear was that I was going to accidentally hit my son instead and I didn't wanna do that, I thought I might kill my son. I called 9-1-1, he would not hold still, my son kept wrestling with him and I started hitting him with the bat. I was in fear of my life, I was in fear of my son's life. This, they, they had, there, there was like super human strength, the[y] just wrestled and rolled around, the furniture moved, it's a tile floor, the[] furniture moved, they were on the sofa, the ottoman, the loveseat, the chair um, he would not stop. At one point he attempted to grab the baseball bat from me, I was able to keep that away from him and every time I could I, I took a swing. I was, like I said, I was fighting for our lives.

After appellant was restrained, the woman's arm was bleeding from the broken glass. She was taken to the hospital and received stitches. She lost the window, rugs, blinds, and furniture. She had to have a hazmat crew come in to clean up the blood. She was "financially destroyed because of the debt."

The day after the incident, appellant told a detective that "he ha[d] taken an assortment of narcotics . . . cannabis, acid, Methylone," and that he "started hearing voices in his head, so he ran out of his house down the street and . . . the voices told him that he needed to go inside [the victims'] house."

Appellant was charged with burglary of a dwelling with an assault or battery, a first degree felony "punishable by imprisonment for a term of years not exceeding life imprisonment." § 810.02(2)(a), Fla. Stat. (2017). He was also charged with battery on a law enforcement officer, criminal mischief ($1,000 or more) and resisting an officer with violence, all third degree felonies carrying a maximum penalty of five years' imprisonment. *See* §§ 784.07(2)(b), 806.13(1)(b)3., 843.01, Fla. Stat. (2017).

### *The Plea Bargain*

On the life felony burglary charge, appellant pleaded no contest to the lesser-included offense of trespass, which in most instances is a misdemeanor. § 810.08, Fla. Stat. (2017). Appellant also pleaded no contest to the remaining three charges. The plea was open, with the proviso that the State would reduce the burglary charge to a trespass and that appellant would pay $21,279.89 in restitution to the woman and her son, various medical facilities, and Martin County Fire and Rescue. Appellant scored thirty-three points on his CPC scoresheet. As the court explained, this score made sentencing "a completely wide open situation. Anywhere from time served . . . to the maximum, which now becomes 15 years in prison," plus the misdemeanor.

### *The Sentencing Hearing*

During the sentencing portion of the hearing, two responding officers testified about the chaos at the crime scene and appellant's bizarre behavior. A detective described his interaction with appellant on the day after the incident. The State played the woman's frantic 911 call. The son described his struggle with appellant and how he "knew [he] was in a little bit of trouble" when appellant wrapped his legs around the son's neck. Finally, the woman told her story of the crime, much of which is quoted above.

On appellant's behalf, his uncle said he was a "kind, loving, happy kid" who was a hard worker and for whom this incident in his life was "just an anomaly." Appellant's father also said that appellant was a "hard worker" who understood that he "took this false step" and "made a mistake." The father said that appellant "want[s] to make this right. He does want to make restitution and he does wanna move on with his life" and "use this as a learning experience and hopefully help someone else down the road." Appellant expressed his remorse—"I wish I could turn back the clock so many times . . . I think about this every single day of my life." He promised the court to "make right on this" no matter what it took.

The State recommended ten years in prison as a sentence, or in the alternative, five years in prison, followed by ten years of probation with no chance of early termination. Appellant's counsel advocated for twenty-four months in prison, followed by any probation sentence the court found appropriate.

In a considered sentencing pronouncement, the trial judge spoke at length about what was on his mind regarding an appropriate sentence. The judge expressed sympathy for appellant's family, which "didn't create this situation," and for the victims, who endured a nightmare.

The judge then focused on the seriousness of appellant's crimes, that citizens have the right to "live free and safe," "without fear that some young person is [] gonna choose to take a drug that makes them psychotically violent with super human strength, break into their home and threaten their lives." The trial court stated:

> It is extremely significant to note that but for serendipity, which means accident . . . [that] [h]uman life was not taken in this case, the life of the defendant, which the State has argued completely justifiably could've been taken the minute he busted through the . . . window or thank God the lives of the 2 people who spoke here as the potential victims in the case. I say potential victims because their lives were not taken and that is just serendipity, period, that they are alive today, period. It was the defendant's bad choice and the grave situation that he created that is of extremely and of an extremely serious nature that makes this case extremely significant warranting serious punishment for the reasons I've stated already.
>
> ***

The State's recommendation may seem harsh to some, but not to the Court because it reflects the danger to the community presented to the victims and to the community which came about by a choice of the defendant to take drugs that any person with common sense should know could bring that person taking such a drug to a courtroom here today to be sentenced by me such as you Mister Gallo.

The judge felt that the seriousness of appellant's crimes elevated general deterrence—the need to deter others—to the most important sentencing factor in the case.

The criminal justice system is created to deter people from doing things that threaten[] the li[ves] of other people, period. The sentencing concern of deterrence, the need to deter others so inclined to take such drugs is so powerful in this case it overwhelms other factors such as the love of the family of the defendant, which I have sympathy for. Their belief in him despite his unwise, dangerous action in this case. The need for deterrence overwhelms the consideration that the defendant has no prior criminal history of conviction, which is reflected on his score sheet. The need for deterrence overwhelms any remorse or apology, that is to any reasonable person, including me, in the statement I'm sorry I took drugs that turned me into a violent psychopath and that I broke into your home and put your life in fear of, of death does not ring loudly to me or to the community. To the people of this community, the statements of the defendant's family that he's a kind, happy, loving, nice person, hard worker, positive influence on children, given the facts of this case do not ring loudly to them, meaning they are not powerful mitigating factors, nor should they be in this case for the reasons I have stated.

***

The sentence to be imposed will not involve probation because the main purpose of this sentence is deterrence. Every young person who would make such a choice should hear and heed the sentence imposed today. Every parent that hears of this sentence should tell their adolescent children of this sentence. This should be done so that no young person makes the choice to take drugs that any person would reasonably know would make them psychotically violent.

The judge adjudicated appellant guilty of all crimes to which he pleaded no contest. On the misdemeanor trespass charge, he sentenced appellant to 300 days in jail. For each of the three felonies, he sentenced appellant to five years in prison, with one term running consecutively to the other two, for a total of ten years in prison. This sentence was less than the fifteen-year sentence that the court might have lawfully imposed for three third degree felonies.

### *Discussion*

Appellant complains because the circuit judge "relied entirely on general deterrence—to the exclusion of all other factors—to justify" the sentence imposed. This is a mischaracterization of the sentencing process, where the record demonstrates that the judge relied on at least four sentencing considerations that have long been part of Anglo-American criminal law.

First, the judge focused on the egregious facts of this case and decided that appellant's conduct was deserving of punishment; under retribution theory, it is "just that one who has caused harm to others should himself suffer for it." WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., HANDBOOK ON CRIMINAL LAW (1972), § 5. Also, "it is claimed that retributive punishment is needed to maintain respect for the law and to suppress acts of private vengeance." *Id.* This case cannot be separated from the victims' blamelessness and the trauma they endured; they were in the privacy of their home when, in the dark of night, appellant crashed through a window and physically attacked them.

Second, the judge engaged in prevention, which "aims to deter the criminal himself (rather than to deter others) from committing further crimes, by giving him an unpleasant experience he will not want to endure again." *Id.* Appellant blames his predicament on the illegal drugs he ingested. Relapse is not uncommon among users of illicit drugs, which may lead to recidivism. The sentence here incentivized appellant not to relapse.

Third, the sentence imposed furthered the goal of incapacitation, where the notion is "that society may protect itself from persons deemed dangerous because of their past criminal conduct by isolating these persons from society." *Id.*

Finally, as described by the judge, the sentence sought to implement the policy of general deterrence which seeks to deter others from taking illicit drugs that might turn them into "violent psychopath[s]." This court

has recognized that general deterrence is a proper sentencing factor in Florida:

> Deterrence, along with retribution, is one of "the traditional aims of punishment." "The premise is that by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they *and others* will be deterred from committing additional criminal offenses." This view of deterrence as a legitimate consideration in sentencing has been recognized in Florida both before and since the adoption of the [Criminal Punishment Code].

*Charles v. State*, 204 So. 3d 63, 66 (Fla. 4th DCA 2016) (internal citations omitted). In *Chambers v. State*, 217 So. 3d 210, 212 (Fla. 4th DCA 2017), we relied on *Charles* to conclude that "where a sentence comports with the sentencing guidelines, a trial court's consideration of deterrence as a sentencing factor does not violate a defendant's due process rights." We explained that in *Charles* we held that

> "it is not impermissible for a sentence to be used as a means of general deterrence." There, we explained that "deterrence, both general ('send a message to the community') and specific (send a message to the individual being sentenced), is not merely one factor amidst the sea of relevant sentencing considerations; it is a key component of punishment itself— the 'primary purpose' of sentencing under the CPC [Criminal Punishment Code]."

*Chambers*, 217 So. 3d at 212 (alterations in original) (quoting *Charles*, 204 So. 2d at 66-67); *see also Andrews v. State*, 207 So. 3d 889, 890 (Fla. 4th DCA 2017). The trial judge's discussion of general deterrence in this case fits comfortably within the *Charles/Chambers* recognition of general deterrence as a valid sentencing consideration.

As appellant notes in his brief, general deterrence as a sentencing tool is not without its critics. But there is anecdotal support of its beneficial effect—enforcement of DUI laws has contributed to the rise of ride-sharing companies like Uber and Lyft and a concomitant decline in DUI arrests. *See* Charles Rabin, *DUI arrests in South Florida plummet. Uber, Lyft, millennials among the reasons why,* MIAMI HERALD, (July 31, 2018) https://www.miamiherald.com/news/local/article215758380.html. Some courts have questioned the deterrent effect of excessively long sentences. *See, e.g., U.S. v. Pressley,* 790 F.3d 699, 701-02 (7th Cir. 2015) (involving

36.67-year sentence). Appellant's ten-year sentence does not approach those long sentences that have drawn the ire of commentators.

Appellant also argues that his sentence is "unconstitutionally disproportionate." He compares himself to other felons who had similar CPC scores. Presumably, these similar scores were acquired by those convicted of third degree felonies. This is an invalid comparison that separates the sentence from the facts of the case.

In his reply brief, appellant questions whether the State would have been able to prove that he had the requisite intent to commit a burglary. However, the plea bargain here did not preclude the trial judge from examining *all* the facts of the case in arriving at an appropriate sentence.

Only because of the work of appellant's trial counsel and the generosity of the prosecutor in reducing the first degree felony charge was appellant offered the chance to plead guilty to a misdemeanor and three third degree felonies instead of a felony carrying a maximum penalty of life imprisonment. The victims were not out for blood—the woman said she did not want the crime to "define the rest of [appellant's] life" or hers. The trial judge compassionately accepted the plea and sentenced appellant to two-thirds of the maximum sentence. The length of the sentence imposed here does not approach any conceivable constitutional limitation.

*Affirmed.*

CONNER and FORST, JJ., concur.

\*　　　\*　　　\*